**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

KEVIN DIDIO,

Plaintiff,

-v- 5:24-CV-471 (AJB/ML)

WESTROCK SERVICES, LLC,

Defendant.

---

**Hon. Anthony Brindisi, U.S. District Judge:**

**DECISION and ORDER**

## I. INTRODUCTION

On December 14, 2023, plaintiff Kevin Didio ("plaintiff") filed this civil action in Supreme Court, Onondaga County, against his former employer, defendant WestRock Services, LLC ("defendant") alleging state-law causes of action for breach of contract, promissory estoppel, and violations of the New York Labor Law ("NYLL"). Dkt. Nos. 1, 2. Thereafter, defendant removed the action to federal court, Dkt. No. 1, answered the complaint, Dkt. No. 5, and the parties completed discovery. *See, e.g.*, Dkt. No. 33.

On November 5, 2025, defendant moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Dkt. No. 36. The motion has been fully briefed, Dkt. Nos. 45, 47, and will be considered on the basis of the submissions without oral argument.

## II. BACKGROUND

Pursuant to Local Rule 56.1, the following facts are drawn from the parties' statements of material facts and the attached exhibits and are undisputed unless otherwise noted.

Plaintiff is a retired sales representative of defendant WestRock, a paper and packaging company, and a series of its predecessor entities. Dkt. No. 37 ("Def.'s SOMF") ¶¶ 1–4. In June 2001, plaintiff first began working for defendant's predecessor, Southern Container, as a sales representative at its Camillus, New York plant. *Id.* ¶¶ 5, 8. His job duties included building and maintaining a "book of business" for the sale of corrugated packaging to various clients. *Id.* ¶ 6; Dkt. No. 41-3 ("Pl.'s Dep.") at 15–16.[1]

Several years later, Southern Container was acquired by a publicly held company named RockTenn and plaintiff's employment continued unchanged. Def.'s SOMF ¶¶ 9–10; Pl.'s Dep. at 16–19. While plaintiff was employed by RockTenn, he was paid a salary and earned commissions based on his sales volume. Def.'s SOMF ¶ 19. These commissions were calculated as "scaled percentages based on profitability." Pl.'s Dep. at 20; Def.'s SOMF ¶ 20.

On July 1, 2015, RockTenn merged with another entity and was renamed WestRock. Def.'s SOMF ¶¶ 11–13. Following the merger, plaintiff continued to work as a sales representative for the remainder of his employment with WestRock. *Id.* ¶ 16. After WestRock became plaintiff's employer, his compensation scheme changed such that it was solely based on commissions earned, and he was no longer paid a base salary. Pl.'s Dep. at 25–26.

From approximately the time of the WestRock merger until his retirement, plaintiff's direct supervisor was Sales Manager John Bucklin ("Bucklin"). Pl.'s Dep. at 22–25; Def.'s SOMF ¶ 17. All sales representatives at the Camillus facility reported to Bucklin. Pl.'s Dep. at 25. Starting in approximately 2005, David Rae ("Rae"), first the Camillus facility's General Manager and later a "Business Unit General Manager," supervised the sales managers and representatives. Pl.'s Dep. at 37–38; Dkt. No. 43-3 ("Rae Dep.") at 27–28. Rae retained supervisory authority over the sales

[1] Citations to the parties' exhibits correspond to each document's internal pagination.

managers and representatives until his position was eliminated in Spring 2023. Pl.'s Dep. at 38; Rae Dep. at 17.

When plaintiff originally joined Southern Container in June 2001, he did not have an existing book of business or any established clients. Def.'s SOMF ¶ 7. In or about 2002, the Camillus facility's General Manager at the time, Joe Andrews, introduced plaintiff to a purchasing representative from a company named First Quality Products. *Id.* ¶¶ 100–03. Plaintiff formed a relationship with First Quality Products and became its sole sales representative. *Id.* ¶ 104.

The First Quality enterprise grew substantially over time, eventually encompassing multiple entities including First Quality Products, First Quality Tissue, First Quality Baby, First Quality Retail, Nutek Disposables, and First Quality Hygienics (collectively the "First Quality accounts"). Def.'s SOMF ¶¶ 66, 103–04. Plaintiff opened several of these accounts based on his original connection with First Quality Products. *Id.* ¶¶ 104, 106.

Throughout his career with WestRock and its predecessors, most of plaintiff's sales were made—and his commissions were earned—on the First Quality accounts. Pl.'s Dep. at 63 ("Q. From 2002 up until your retirement, roughly what percentage of your work would you say was for these First Quality entities? A. Ninety-five percent of my time."); Rae Dep. at 150.

Shortly before the merger in 2015 that created WestRock, plaintiff and other sales representatives attended a meeting for the entire corrugated division, during which RockTenn, then plaintiff's employer, announced that it would roll out a new compensation program in 2016 (the "2016 Program"). Def.'s SOMF ¶¶ 21–22; Dkt. No. 48 ("Def.'s Reply SOMF") ¶ 9.

During the meeting, sales employees were provided hard copies of a PowerPoint presentation titled "Introducing the New Compensation Program for Corrugated Sales Representatives" (the "PowerPoint"). Def.'s SOMF ¶ 25. RockTenn also provided the sales representatives with a

booklet titled "A New View: Sales Compensation Program" (the "Booklet"). *Id.* ¶ 26. Other than the PowerPoint and the Booklet, plaintiff and the other sales representatives were not provided with any other documentation governing the terms of the 2016 Program. *Id.* ¶ 28.

The Booklet introduced the 2016 Program as "[o]ne program for all Corrugated Sales," noting that:

> The Company has grown through mergers and acquisitions, resulting in multiple commission plans. The Corrugated Sales team will now have one compensation program that works for all. This makes administration easier and ensures equity among various groups within the Corrugated team.

Dkt. No. 39-7 ("Booklet") at D000110.

The PowerPoint slide titled "Structure" stated that sales representatives would earn commissions equal to "1% of Net Sales." Dkt. No. 44-1 ("PowerPoint") at D000081. Further, the slide stated that sales representatives could earn additional "Adders" consisting of 1% of net sales for new accounts and 0.5% of net sales for various "strategic" or premium products. *Id.*; *see also* Booklet at D000111.

Notably, both pre- and post-merger, each account was categorized as either local or national. Def.'s SOMF ¶ 83; PowerPoint at D000078. Whether an account was designated local or national impacted manufacturing, shipping, customer service, and the sales representative's commission. Rae Dep. at 106–08, 130–31. Company management had discretion to determine whether an account would be classified as local or national. Def.'s SOMF ¶ 84. The First Quality accounts, although they expanded to include operations across multiple states, were maintained as local accounts for the entirety of plaintiff's tenure with the company. *Id.* ¶ 92; Rae Dep. at 85.

Under the 2016 Program, monthly commissions on local accounts were uncapped. *See* Booklet at D000110 ("There will be no limit on what you can earn per month on local accounts.").

By contrast, commissions on national accounts were capped at three thousand dollars per month. PowerPoint at D000078 ("No caps (Dollar Limits) on Local Accounts (Nat'l Account Servicing capped at 3,000 per month per account).") (emphasis in original).

The parties dispute whether the 2016 Program provided for a 1% net sales commission across the board for sales representatives with local accounts. According to defendant, the 2016 Program differentiated between a generating sales representative and a servicing sales representative. Def.'s SOMF ¶¶ 89–90; *see* Bucklin Dep. at 39 ("[T]he commission program either pays generating, service, half percent for each, or one percent if you are both . . . . You can only pay one [representative] servicing, and you can only pay one [representative] generating."); Rae Dep. at 91 ("The individual on local accounts, depending on their role in the account, would get . . . 1 percent of net sales . . . . And their role would have to be they generated the account plus they service the account. So in other words, they open the account, they get a half a percent plus margin for that, and then they get another half percent . . . for servicing.").

Plaintiff, for his part, acknowledges that "an employee who opened an account could be considered the account's generating representative and an employee who handled an account's day-to-day management could be considered the account's servicing representative," Pl.'s Resp. SOMF ¶ 91, but sharply disputes that these terms were used prior to 2020. Pl.'s Dep. at 94–95 ("Q: Mr. Didio, so just to confirm, is it your testimony that, pursuant to [the 2016 Program], there would be no distinction between commissions payable to a generating representative and a servicing representative? A: That was my understanding, yes."); *id.* at 101–02 ("Q: It's your testimony that neither Mr. Rae nor anyone else in senior management ever discussed this generating or servicing concept with you prior to 2020? A. On or about."); Dkt. No. 44 ("Didio Decl.") ¶¶ 17, 22–

23. The 2016 Program materials are silent as to the distinction between a generating representative and a servicing representative. *See generally* PowerPoint; Booklet.

Additionally, the 2016 Program modified how sales representatives were paid. The PowerPoint stated that sales representatives would be paid a "Quarterly commission against semi-monthly draw," PowerPoint at D000081, meaning each sales representative would be paid a sum every two weeks based on their historical sales data and, at the end of each quarter, would receive an additional sum if there was a positive balance or refund the company if there was a negative balance. Rae Dep. at 88–89.

The PowerPoint provided a timeline for the implementation of the 2016 Program as follows:

> - Three months (90 days) of education only/no change to existing program(s): July 1 to September 30, 2015
>   - Side-by-side comparisons of existing vs. new plan available.
> - Six month transition period (October 1, 2015 to March 31, 2016), during which reps will be paid on new commission structure with the following limitations:
>   - Not less than 90% of existing plan, and
>   - Not more than 120% of existing plan.
> - New program effective without limitations: **April 1, 2016**

PowerPoint at D000108 (emphasis in original).

After the 2016 Program's rollout, plaintiff became worried that he was not being paid in accordance with the terms outlined in the PowerPoint and the Booklet for his work on the First Quality accounts. Pl.'s Dep. at 88–89. Rae called plaintiff into his office to discuss his concerns.[2] Def.'s SOMF ¶¶ 30–31; Didio Decl. ¶ 18. Plaintiff acknowledges that he met with Rae in person

[2] The date of this meeting is not established by the record.

but disputes that this meeting included a discussion of his "commission structure." Dkt. No. 46 ("Pl.'s Resp. SOMF")[3] ¶¶ 30–31.

That said, it is undisputed that in this meeting, Rae informed plaintiff that he "wouldn't be on the corporate program for First Quality" and that plaintiff "was making too much money for Central New York." Pl.'s Resp. SOMF ¶ 31; Pl.'s Dep. at 89–90. Specifically, Rae "indicated that [plaintiff] would be paid a lower percentage than the one percent" provided in the 2016 Program materials. Pl.'s Dep. at 90. Further, Rae told plaintiff that the percentage he would be paid would vary based on "the First Quality location and based on the product that we were selling." *Id.* at 91.

Rae "didn't tell [plaintiff] exactly at that time" what his commission arrangement would be. Pl.'s Dep. at 91. But by approximately late 2016 or early 2017, Rae had provided plaintiff with more details about how his commissions would be calculated. Def.'s SOMF ¶ 33. Rae also informed plaintiff that he would not be on the new semi-monthly draw payment plan outlined by the 2016 Program and would instead continue to be paid monthly. Rae Dep. at 89–91; Pl.'s Dep. at 30–32.

Thereafter, plaintiff was paid in accordance with what Rae verbally described to him in 2016. Def.'s SOMF ¶¶ 35–36. Additionally, he received monthly commission statements and was able to view a breakdown of his commission statements using a platform called QlikView. Pl.'s Dep. at 92 ("Q. At some point in time did Mr. Rae provide you with a structure that would apply to you as to how your commissions were being calculated? . . . . A. No. I received it on my monthly commission statement. That's when I learned."); *id.* ("Q. Would you agree that each of those

---

[3] Although plaintiff's responses to defendant's statement of material facts and plaintiff's statement of additional material facts are contained in the same document, the Court cites plaintiff's responses to WestRock's statement of material facts, Dkt. No. 46 at 1–11, as "Pl.'s Resp. SOMF" and plaintiff's statement of additional material facts, *id.* at 12–16, as "Pl.'s Add'l SOMF" to avoid any confusion.

monthly commission statements detailed what your sales were and what commissions were being calculated? . . . . A. Yes."); Pl.'s Resp. SOMF ¶ 53.

The QlikView platform provided sales representatives with multiple data points about their sales transactions. Pl.'s Dep. at 125 ("Q. What information would the [QlikView] program or dashboard show you? A. It would show you the account name; it would show you the gross sales; the net sales; it would show you any rebates or any discounts, I believe; and then it would show you your – basically your monthly sales information."); *see also* Bucklin Dep. at 71–72 ("Q. And in your opinion, would that benefit of the program induce the sales representative . . . to want to work hard and want to generate profit for the company, understanding that it would mean greater potential compensation for them? A. I would think so. I mean, in addition, I think one of the bigger things, too, was the [QlikView] sales dashboard, which would show the transparency of every single transaction, from a contribution, from a, you know, new account business – to new business to volume, it has . . . every data point almost in just about in real time of every transaction. And you can also see where your margin, where you can improve your margin with the trends and so on."). Plaintiff accessed QlikView on a monthly basis to view his commission statements. Pl.'s Dep. at 126.

Plaintiff did not speak to anyone besides Rae regarding his concern that he was not being paid in accordance with the 2016 Program.[4] Pl.'s Dep. at 107–08 ("Q. Was there someone in corporate to whom you could escalate your disagreement about how your commissions were being calculated? A. No."); *id.* at 108 ("Q. Did you ever communicate with [Rae's superior] Mr. Russell? A. No. You have to understand that everything was contained within the four walls of Camillus.").

[4] Plaintiff denies that he only spoke with Rae about his commissions, but his citations to the record do not provide any support during the relevant time period, *i.e.*, between 2016 and 2021. *See* Pl.'s Resp. SOMF ¶ 48.

While there was "always a human resource[s] associate onsite" at the Camillus facility, *id.* at 142, plaintiff did not discuss his commissions with her. *Id.* at 143 ("Q. Did you ever talk to Stacy about your commissions? A. No. I was told not to. Q. By who? A. David Rae.").

Plaintiff contends that he did not speak to anyone else about his concerns because Rae threatened to terminate his employment if he did so. Didio Decl. ¶ 20; Pl.'s Dep. at 109 ("Q. Who told you not to? A. Mr. Rae told me that . . . I 'make too much money for [C]entral New York,' and that 'if I did, I could be walked to the door' or 'I would walk you to the door.'"). Defendant disputes that Rae threatened plaintiff with termination. Def.'s Reply SOMF ¶ 20.

In 2021, Rae, Bucklin, and Mark Ambrusko, then the General Manager of the Camillus facility, met with plaintiff to advise him of changes to his commission structure. Def.'s SOMF ¶ 38; Pl.'s Dep. at 44–46. These changes were memorialized in a letter from Rae that plaintiff acknowledged and signed on May 10, 2021 (the "2021 Agreement"). Def.'s SOMF ¶ 39; Dkt. No. 39-8 ("2021 Agreement") at D000044–45. As relevant here, the 2021 Agreement stated:

> Effective June 1, 2021, your commissions, before applicable deductions and withholding, will be as set forth below.
>
> - First Quality account:
>     - For servicing roles indicated in Exhibit 1, you will be paid the servicing volume commission of 0.5% of net sales plus the servicing contribution commission for the First Quality account.
>     - For generating roles indicated in Exhibit 1, you will be paid the generating volume commission of 0.5% of net sales, plus the generating contribution commission, plus the generating premium product commission for the First Quality account.
> - For all your other accounts, you will be paid commissions in accordance with the WestRock Commission Program currently in effect.
> - Your position is considered by WestRock to be exempt for purposes of the Fair Labor Standards Act and any applicable state wage and hour laws, so you will not be entitled to overtime pay.

2021 Agreement at D000044.

The 2021 Agreement changed the frequency of plaintiff's commission payments from monthly to quarterly. Pl.'s Dep. at 26–27. Aside from the frequency of his payments, the parties dispute how the 2021 Agreement changed plaintiff's commission arrangement from what was already in place.

Plaintiff claims that the terms "generating" and "servicing" were first used in connection with the 2021 Agreement, and that this change was the crux of the 2021 Agreement. Didio Decl. ¶ 25 ("[T]he generating vs. servicing distinction was the only "change" in my commission structure . . . this was an entirely new distinction which had not previously been instituted, and which was never part of the [2016 Program]. Indeed, this distinction *was* the change[.]").

Defendant, for its part, claims that these terms were deeply engrained in the 2016 Program. Def.'s SOMF ¶¶ 89–90; *see* Bucklin Dep. at 40 ("Q. And to your knowledge . . . was that also the case between approximately 2016 and 2021, where you could have one individual be both the generating and the servicing on an account? A. Yeah . . . . it definitely was like that I would say from . . . whenever the new plan did come out there. That is what the plan was, the generating and servicing, half percent for both."); Rae Dep. at 133 ("Q. [T]hat particular portion of the PowerPoint . . . did not delineate between generating and servicing, correct? A. That page did not. No. I don't know if any of the other part[s] of the plan did or didn't . . . . But it was – it was common knowledge to the sales reps, and including [plaintiff], what that . . . meant.").

Plaintiff was paid in accordance with the terms of the 2021 Agreement until his retirement. Def.'s SOMF ¶¶ 42, 43; Pl.'s Dep. at 49. On September 7, 2023, eight days before his retirement date, plaintiff emailed WestRock human resources personnel claiming that he was owed unpaid commissions in the amount of $653,611.84 for work performed on the First Quality accounts in

fiscal years 2017 through 2022 (the "2023 E-mail").[5] Def.'s SOMF ¶ 45. In the 2023 E-mail, plaintiff stated that he "did not communicate [his entitlement to unpaid commissions] previously" because he "was told by WestRock Camillus managers 'you make [too] much money as it is'" and he was "threatened with [his] job if [he] caused any problems." Dkt. No. 39-9 ("2023 E-mail") at D000113.

Plaintiff voluntarily retired from WestRock on or about September 15, 2023. Def.'s SOMF ¶ 44. This case followed.

## III. LEGAL STANDARD

The entry of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is considered "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In conducting this analysis, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-movant. *Anderson*, 477 U.S. at 255. Even so, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Further, "[a] question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant."

[5] At all relevant times, WestRock's fiscal years ran from October 1 through September 30 of the following year. Def.'s SOMF ¶ 62.

*Turner v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 131 (E.D.N.Y. 2023) (citing *Anderson*, 477 U.S. at 247–48).

"'The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists,' but 'when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to' an absence of evidence 'on an essential element of the nonmovant's claim.'" *Bustamante v. KIND, LLC*, 100 F.4th 419, 432 (2d Cir. 2024) (quoting *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023)).

## IV. DISCUSSION

Plaintiff's five-count complaint asserts claims for breach of contract (Count I), promissory estoppel (Count II), violations of NYLL §§ 191(1)(c) and 191-c (Counts III and IV), and damages under NYLL § 198 (Count V). Dkt. No. 2 ("Compl.") ¶¶ 28–54.

### A. Abandonment

As an initial matter, however, plaintiff has abandoned all but one of his claims. Defendant has moved for summary judgment on each of plaintiff's claims. Dkt. No. 38 ("Def.'s Mot.") at 7–8.[6] In opposition, plaintiff solely argues that summary judgment is inappropriate because there are genuine disputes of material fact regarding his promissory estoppel claim. *See generally* Dkt. No. 45 ("Pl.'s Opp."). However, plaintiff has not opposed dismissal of his breach of contract claim (Count I). *Id.* Nor has he opposed dismissal of his claims under the NYLL (Counts III, IV, and V). *Id.*

The Second Circuit has instructed that where, as here, a counseled litigant chooses to file a partial opposition to a motion for summary judgment, a court may "infer . . . that relevant claims

[6] Citations to the parties' briefing correspond to the electronically generated CM/ECF pagination.

or defenses that are not defended have been abandoned." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). The Court explained:

> Generally, but perhaps not always, a partial response [to a motion for summary judgment] reflects a decision by a party's attorney to pursue some claims or defenses and to abandon others. Pleadings often are designed to include all possible claims or defenses, and parties are always free to abandon some of them. Moreover, preparation of a response to a motion for summary judgment is a particularly appropriate time for a non-movant party to decide whether to pursue or abandon some claims or defenses. Indeed, Rule 56 is known as a highly useful method of narrowing the issues for trial.

*Id.* at 196.

Upon review, plaintiff has abandoned these undefended claims. Defendant has moved for summary judgment and asked the Court to dismiss the complaint "in its entirety, with prejudice." Def.'s Mot. at 7. In his opposition papers, plaintiff has not mounted any defense against defendant's facially valid arguments in favor of dismissal. *See, e.g.*, *Kovaco v. Rockbestos-Surprenant Cable Co.*, 834 F.3d 128, 143 (2d Cir. 2016) (instructing lower courts to make a specific finding of abandonment where appropriate). Accordingly, plaintiff's claims alleging breach of contract (Count I) and violations of the NYLL (Counts III, IV, and V) have been abandoned and will be dismissed.

**B. Promissory Estoppel**

Plaintiff's only remaining claim is for promissory estoppel. Plaintiff argues that he is entitled to unpaid commissions he earned on the First Quality accounts from fiscal year 2017 through June 1, 2021, when the 2021 Agreement took effect. Def.'s SOMF ¶¶ 40–43, 60–61; Pl.'s Resp. SOMF ¶¶ 40–43, 60–61.

Defendant argues that it is entitled to summary judgment on plaintiff's promissory estoppel claim because (1) New York courts do not recognize promissory estoppel in the employment

context; and (2) in any event, plaintiff has failed to prove any of the elements of a promissory estoppel claim. Def.'s Mot. at 29–31. In opposition, plaintiff argues that New York courts have recognized promissory estoppel claims in this context and that there are disputed issues of material fact precluding summary judgment. Pl.'s Opp. at 7–11.

Promissory estoppel is "a narrow doctrine which generally only applies where there is no written contract, or where the parties' written contract is unenforceable for some reason." *Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 257 F. Supp. 3d 348, 361 (S.D.N.Y. 2017) (quoting *Paxi, LLC v. Shiseido Americas Corp.*, 636 F. Supp. 2d 275, 287 (S.D.N.Y. 2009)).

The elements of a claim for promissory estoppel are (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the party to whom the promise was made; and (3) an injury to the party to whom the promise was made by reason of the reliance.[7] *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 202 (2d Cir. 2019); *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

As an initial matter, defendant argues that New York law does not recognize promissory estoppel in the employment context. Other courts in this Circuit have been unable to identify any direct support for this proposition from New York state courts.[8] *See, e.g.*, *R.R. Donnelley & Sons Co. v. Marino*, 2021 WL 4441515, at *5 (W.D.N.Y. Sept. 28, 2021) (quoting *Shetel Indus. LLC. v. Adin Dental Implant Sys., Inc.*, 2021 WL 1108666, at *5 (E.D.N.Y. Mar. 23, 2021)) ("Courts in this Circuit disagree regarding the extent to which New York law permits promissory estoppel

[7] While the New York Court of Appeals has "never recognized promissory estoppel as a standalone cause of action, the Appellate Division has done so in at least some circumstances, and its departments are unanimous that an essential element of a promissory estoppel claim is a 'clear and unambiguous promise.'" *Bentkowski v. City of New York*, 44 N.Y.3d 611, 619 (2025) (declining to recognize promissory estoppel as an independent cause of action where plaintiffs failed to establish a clear and unambiguous promise).

[8] To the contrary, plaintiff cites a New York state court case denying summary judgment on a promissory estoppel claim in the employment context in a similar dispute over allegedly unpaid commissions. *See* Pl.'s Opp. at 7–9 (citing *Hensel v. Bestpass, Inc.*, 77 Misc. 3d 1011, 1013–14 (N.Y. Sup. Ct. 2022)).

claims in the employment context."); *Hallett v. Stuart Dean Co.*, 517 F. Supp. 3d 260, 285 (S.D.N.Y. 2021) ("Defendants have still offered no New York state court case showing that promissory estoppel is categorically unavailable in the employment context."); *Joshi v. Trs. of Columbia Univ. in City of New York*, 2018 WL 2417846, at *9 (S.D.N.Y. May 29, 2018) ("[W]hile the defendants cite two cases from the Southern District of New York to support [a categorical rejection of promissory estoppel in the employment context], subsequent courts in this District that have analyzed the question have been unable to identify any direct support from New York state courts."); *Lai v. Deiorio Foods Inc.*, 2016 WL 814930, at *7 (N.D.N.Y. Feb. 29, 2016) ("Even if promissory estoppel were cognizable in the employment context, Plaintiff has failed to articulate a plausible claim."). That said, the Court need not resolve this question. As discussed further below, even assuming such a claim exists under New York law, plaintiff cannot establish the elements of promissory estoppel on the record currently before the Court. *See Drummond v. Akselrad*, 2023 WL 3173780, at *11 (S.D.N.Y. May 1, 2023) ("Although Plaintiff's promissory estoppel claim is not barred by New York state law, Plaintiff fails to allege all of the elements of promissory estoppel because . . . he does not allege an injury resulting from his reliance on Defendants' promise.").

On the merits, defendant argues that plaintiff cannot point to any clear and unambiguous promise. Def.'s Mot. at 29. According to defendant, plaintiff solely relies upon the PowerPoint and the Booklet provided to all sales representatives at the 2016 Program meeting, which are "ambiguous as to the calculation of commissions and do not clearly convey a requirement to pay all sales representatives a minimum 1% commission on net sales." *Id.* at 30.

Upon review, defendant is correct. As defendant notes, plaintiff selectively relies upon "isolated illustrative slides" to demonstrate that there was "a clear, unambiguous compensation

term." Dkt. No. 47 ("Def.'s Reply") at 7. But "the same [PowerPoint] also references numerous other factors considered in calculating commissions—including margin or profit, account start date, and product type—without explaining how those factors are weighed, how they interact, or how commissions were actually determined in practice." *Id.*; PowerPoint at D000081; Booklet at D000110–11.

Indeed, neither document discusses a distinction between a "servicing" or a "generating" sales representative for commission purposes. *See generally* PowerPoint; Booklet. At best, the documents are ambiguous: the available fact record is insufficient to allow a fact-finder to draw a conclusion about whether these terms were or were not part of the 2016 Program. *Compare* Bucklin Dep. at 39 ("[T]he commission program either pays generating, service, half percent for each, or one percent if you are both . . . .") *and* Rae Dep. at 133 ("Q. [T]hat particular portion of the PowerPoint . . . did not delineate between generating and servicing, correct? A. That page did not. No. I don't know if any of the other part[s] of the plan did or didn't. I didn't see that. But it was – it was common knowledge to the sales reps, and including [plaintiff], what that . . . meant.") *with* Pl.'s Dep. at 94–95 ("Q: Mr. Didio, so just to confirm, is it your testimony that, pursuant to [the 2016 Program], there would be no distinction between commissions payable to a generating representative and a servicing representative? A: That was my understanding, yes.").

Even viewed in the light most favorable to plaintiff, the non-movant, the discovery record permits only one conclusion: defendant is entitled to summary judgment because there was no "clear and unambiguous promise." In addition to the documents' ambiguity, it is undisputed that plaintiff met with Rae in the months following the 2016 Program meeting and was explicitly told that he would *not* be paid in accordance with the materials. *See* Pl.'s Resp. SOMF ¶ 31; Pl.'s Dep. at 89–91.

Plaintiff's subjective belief that he *should* have been paid in a particular way does not create a genuine dispute of material fact precluding summary judgment on a promissory estoppel claim. *See, e.g.*, *That's What She Said, Inc. v. Gutter Games Ltd.*, 2024 WL 3678473, at *11 (S.D.N.Y. Aug. 5, 2024) (granting summary judgment where "none of [plaintiff's] employees could articulate the precise terms of [defendant's] promise or point to any written primary source material setting forth the same"), *appeal dismissed sub nom. That's What She Said, Inc. v. Perch UK 1 LTD*, 2024 WL 4762973 (2d Cir. Sept. 9, 2024); *Richbell Info. Servs. v. Jupiter Partners*, 309 A.D.2d 288, 304 (1st Dep't 2003) (finding alleged promise to be "too indefinite to be the type of clear and unambiguous promise required for promissory estoppel").

Additionally, plaintiff's attempt to create a dispute of material fact is without merit. Plaintiff argues that there was no distinction between a generating and a servicing representative until 2021, so the company could not have intended for the 2016 Program to differentiate between the two. *See* Pl.'s Resp. SOMF ¶ 93 ("Denies there was any distinction before June 2021 in the percentage commission an employee would receive based upon whether the employee was the generating or servicing representative on a given customer account."); Pl.'s Dep. at 94–95, 101–02; Didio Decl. ¶¶ 17, 22–23.

While, as discussed above, this fact is clearly in dispute, *see* Def.'s SOMF ¶¶ 89–90, 93; Rae Dep. at 91; Bucklin Dep. at 39, it is not material to the Court's determination because it would not "affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Whether or not the 2016 Program included limitations based on generating or servicing an account, plaintiff was explicitly told that his commissions would not comport with the 2016 Program. Pl.'s Resp. SOMF ¶ 31; Pl.'s Dep. at 89–91.

Thus, even if this fact were resolved in plaintiff's favor, there is no basis in the record from which to conclude that defendant ever made a "clear and unambiguous promise" to pay plaintiff 1% net commissions on the First Quality accounts. *See, e.g.*, *Tri-Cnty. Motors, Inc. v. Am. Suzuki Motor Corp.*, 494 F. Supp. 2d 161 (E.D.N.Y. 2007) (holding that "nonspecific pledge" that no deal candidate would "be unreasonably denied [deal] . . . simply [could not] be construed as a clear and unambiguous promise").[9]

The Court can imagine a scenario in which plaintiff could prove a "clear and unambiguous promise" was made. For example, plaintiff could provide evidence that at the 2016 Program meeting, a presenter stated that the 2016 Program was binding and the 1% net sales commission would apply to all accounts without exception. Alternatively, plaintiff could provide evidence that he met with management and was told verbally or in writing that the 2016 Program would apply to all of his accounts, including First Quality. *See, e.g.*, *Aleem v. Experience Hendrix, L.L.C.*, 413 F. Supp. 3d 251, 260 (S.D.N.Y. 2019) (declining to grant summary judgment on promissory estoppel claim where a reasonable jury could credit plaintiff's "plausible, albeit unlikely" explanations that a clear and unambiguous promise was made).

But neither plaintiff nor the record in this case provides any of these facts. "[C]ourts 'rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present.'" *Carter v. Broome County*, 394 F. Supp. 3d 228, 238 (N.D.N.Y. 2019) (Hurd, J.) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)); *see also Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)

---

[9] Plaintiff's contention that Rae threatened to terminate his employment fares no better. Pl.'s Opp. at 10. Again, while this fact is sharply disputed, Didio Decl. ¶ 20; Def.'s Reply SOMF ¶ 20, it is not material to the Court's determination. Even without the alleged conversations between plaintiff and Rae, no reasonable juror could conclude that a "clear and unambiguous promise" was made based on the PowerPoint and Booklet alone. *See Anderson*, 477 U.S. at 252 (emphasizing that "there must be evidence on which the jury could reasonably find for the plaintiff" at the summary-judgment stage).

("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."); *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 130 (2d Cir. 2012) (declining to address argument in the first instance on appeal where parties did not frame issue for district court).

Viewing the facts presented in the light most favorable to the non-movant, no reasonable juror could conclude that defendant made a "clear and unambiguous promise" to pay plaintiff a 1% commission on the First Quality accounts. Even if the Court were to assume that the 2016 Program materials could reasonably be understood to communicate a 1% net sales commission generally, the record indicates that plaintiff was informed his commission would not be paid in accordance with the 2016 Program. Pl.'s Resp. SOMF ¶ 31; Pl.'s Dep. at 89–91.

Further, as discussed above, even if Rae had not told plaintiff his compensation would differ after the meeting, the PowerPoint and Booklet standing alone do not form a "clear and unambiguous promise," either. *See, e.g.*, *Henneberry v. Sumitomo Corp. of America*, 415 F. Supp. 2d 423, 444 (S.D.N.Y. 2006) ("Courts have held that, absent a distinct communication to be bound, a statement by one party to another that evinces the speaker's desire to consummate or further a commercial transaction does not constitute a clear and unambiguous promise.") (collecting cases).

Even if the Court were to assume that a "clear and unambiguous promise" had been made to plaintiff via the 2016 Program materials, his promissory estoppel claim would still fail because he cannot establish the second and third elements of the claim, *i.e.*, reasonable reliance and an injury caused by the reliance. As to the second element, no reasonable juror could conclude that plaintiff reasonably relied on the materials when it is undisputed that Rae told plaintiff he would not be paid consistent with the terms of the 2016 Program, both in terms of the commission percentage and the frequency of his payments. *See* Def.'s SOMF ¶¶ 33, 35–36; Rae Dep. at 89–91;

Pl.'s Dep. at 30–32; *see also, e.g.*, *Ashland Inc. v. Morgan Stanley & Co.*, 700 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) (holding defendant's alleged promise was "so vague and indefinite that reliance upon that promise . . . cannot be said to be reasonable"), *aff'd*, 652 F.3d 333 (2d Cir. 2011).

Finally, plaintiff cannot establish the injury element of his claim as a matter of law. Where, as here, a plaintiff invokes the doctrine of promissory estoppel "to circumvent the Statute of Frauds, [the plaintiff] must demonstrate 'unconscionable' injury, *i.e.*, injury beyond that which flows naturally (expectation damages) from the non-performance of the unenforceable agreement.'"[10] *Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329, 341 (S.D.N.Y. 2008) (quoting *Merex A.G. v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 826 (2d Cir. 1994)).

The Second Circuit and the New York Court of Appeals have cautioned that a finding of unconscionable injury should be "limited" and "rare." *See Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (2d Cir. 1977); *In re Estate of Hennel*, 29 N.Y.3d 487, 497 (2017). "For example, lost sales, opportunities, and clients, even when significant, do not give rise to an unconscionable injury." *Aleem*, 413 F. Supp. 3d at 261 (citing *Darby Trading Inc.*, 568 F. Supp. 2d at 342). Plaintiff's alleged injuries, consisting of lost commissions and opportunities, are most aptly described as expectation damages. *See* Pl.'s Opp. at 10. Because "the demonstration of such typical expectation damages, without more, does not demonstrate an unconscionable injury," *Darby Trading Inc.*, 568 F. Supp. 2d at 342 (citation omitted), plaintiff cannot establish the third element of his promissory estoppel claim.

---

[10] The Statute of Frauds requires certain contracts, agreements, or transactions to be in writing. N.Y. Gen. Oblig. Law § 5-701. The 2016 Program falls within the Statute of Frauds because "a service contract that is not time limited (of 'indefinite duration') and in which 'one party agrees to procure customers or accounts or orders on behalf of' another is not by its terms performable within a year and thus must be in writing." *Tal v. Computech Int'l, Inc.*, 2024 WL 4836345, at *4 (E.D.N.Y. Nov. 20, 2024) (quoting *Nasso v. Bio Reference Labs., Inc.*, 892 F. Supp. 2d 439, 447 (E.D.N.Y. 2012)).

Thus, based on the record provided, no reasonable juror could conclude that plaintiff received a "clear and unambiguous promise" from defendant that he would be paid a 1% commission on his net sales. Therefore, defendant is entitled to summary judgment. As plaintiff has abandoned all of his other claims, the complaint will be dismissed in its entirety.

## V. CONCLUSION

Therefore, it is

ORDERED that

1. Defendant's motion for summary judgment (Dkt. No. 36) is GRANTED; and
2. The complaint is DISMISSED.

The Clerk of the Court is respectfully directed to terminate the pending motion and close the case.

**IT IS SO ORDERED.**

Dated: September 21, 2026
Utica, New York.

Anthony J. Brindisi
U.S. District Judge